IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JUNE L. WHITE, | § | |
|     PLAINTIFF, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:08-CV-415-Y |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
|     DEFENDANT. | § | |

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.     STATEMENT OF THE CASE

Plaintiff June L. White filed this action pursuant to Sections 405(g) and 1383(c)(3) of Title

42 of the United States Code for judicial review of a final decision of the Commissioner of Social

Security denying her claims for disability insurance benefits under Title II and supplemental security

income(SSI) under Title XVI of the Social Security Act.    White  applied for disability insurance

benefits and SSI on March 5, 2003. She initially alleged a disability onset date of April 1999, but

later amended her applications to allege that she is entitled to a closed period of disability

commencing April 30, 2003 and ending October 3, 2006. (Tr. 17-18).  White maintained her insured

status for purposes of disability insurance benefits through December 2004. (Tr. 67). Disability must be established on or before that date to establish entitlement to disability insurance benefits. *See generally Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078, 1080 n.1 (5th Cir. 1981). Expiration of her insured status does not affect her claim for SSI, but SSI cannot be paid for the time preceding an application for benefits even if disability began earlier. *See* 20 C.F.R. § 416.335.

After the Social Security Administration denied her applications for benefits both initially and on reconsideration, White requested a hearing before an administrative law judge (the "ALJ"). ALJ Ward D. King held a hearing and issued an unfavorable decision in June 2005, but the Appeals Council vacated that decision and remanded the claim for further development of the record. (Tr. 365, 374-76). After remand from the Appeals Council, the ALJ held a supplemental hearing on June 15, 2007, and issued another unfavorable decision on July 27, 2007. (Tr. 17-28). This decision stands as the final decision of the Commissioner because the Appeals Council denied White's request for review. (Tr. 7).

B.    STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant

must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is not severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837

F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.    ISSUES

    1.    Whether the ALJ erred in identifying White's severe impairments;

    2.    Whether substantial evidence supports the ALJ's assessment of her residual functional capacity; and

    3.    Whether the Commissioner met his burden to demonstrate that White is capable of performing other work that exists in significant numbers in the national economy.

D.    ADMINISTRATIVE RECORD

    1.    Treatment History

White injured her neck and back while working in April 1999. (Tr. 119-24). Conservative treatment measures failed to provide relief, and White underwent an anterior lumbar interbody fusion on February 5, 2001. (Tr. 140, 153, 174). Following the surgery, White reported improvement, but complained of leg pain that she did not have before the surgery. (Tr. 170-72). Magnetic resonance imaging (MRI) in September 2001 showed a diffuse broad-based disc bulge at L5-S1 that slightly abutted the epidural sac. (Tr. 150-151).

White transferred her care to John A. Malonis, M.D., in December 2001. He reviewed the MRI, which showed that the interbody fusion was healed and revealed significant foraminal narrowing of the right L5 nerve root, but Malonis was unable to identify the source of the narrowing. (Tr. 188). On examination, White walked with a relatively normal gait. Palpation of her back revealed no significant tenderness, and she was able to flex and extend relatively normally. (Tr. 188). Malonis administered a nerve root block on December 21, 2001, to give White some symptomatic relief. (Tr. 188, 190).

White had a series of examinations in connection with her workers' compensation claim to determine whether she had reached maximum medical improvement. Philip Osborne, M.D., evaluated White in April 2002 and noted that White had exhibited every positive Waddell's sign[1] that one could have and had an inconsistent score on the Beck depression scale. He also noted inconsistences in her performance on range-of-motion testing that invalidated the results. (Tr. 192-203). This was similar to his assessment of White in September 2000 when he found clinically significant indicators of symptom magnification. (Tr. 208-217). Osborne pointed out that White's significant pain behaviors were correlated with a 93-94% chance that no intervention would be effective in her case, (Tr. 192), and that his previous opinion had been vindicated by White's failure to benefit from surgery. He classified her as having a failed back syndrome. (Tr. 193).

White's medical records were evaluated in September 2002 by N.F. Tsourmas, M.D., who

---

[1] Waddell's signs are eight clinical findings that indicate that a complaint of back paint is not caused by physical abnormality; the presence of three or more of these findings is usually considered sufficient to make a diagnosis of functional disorder or deliberate deception and rule out physical abnormality. *Mettlen v. Commissioner of Social Security*, 2003 WL 1889011, *9 (E.D. Tex. 2003). *See also* ATTORNEY'S MEDICAL DESKBOOK § 18:4 (4th ed. 2008).

praised the thoroughness of Osborne's evaluation. (Tr. 225). Tsourmas opined that White would have lifelong L5-S1 residual disc problems, which would require palliative care, but he did not recommend further invasive treatment. Tsourmas further opined that White was able to work at a sedentary or light-duty capacity. (Tr. 225-26).

A consultative examination was performed April 28, 2003, by Ade L. Adedokun, D.O. (Tr. 227-230). White complained of pain radiating into her right lower extremity with numbness and tingling of the first three digits on her foot. She also complained of pain with prolonged sitting or standing. Her current medications included Vicodin and Ultram for pain, Soma as a muscle relaxer, and Desyrel for depression. (Tr. 227). White reported that she performed activities of daily living independently. She ambulated without an assistive device, but had a slightly antalgic gait and almost fell when performing a tandem gait. She refused to walk on her heels or tiptoes, and she refused to squat or hop secondary to pain and a fear of falling. (Tr. 228). Manual muscle testing was 5/5 in her upper extremities and left lower extremity and 4+/5 in her right lower extremity secondary to pain and some give-way weakness. Deep tendon reflexes were equal and symmetrical, but sensation was decreased in her right foot. White declined to perform a straight leg raising test and reported being unable to flex or extend her hip due to pain. She was able to pick up a fifteen to twenty pound object. Adedokun opined that White exhibited symptom magnification. (Tr. 229). He ordered a lumbosacral x-ray, which showed complete obliteration of the L5-S1 disc space that was the site of White's previous surgery. The remaining lumbar disc spaces appeared well maintained. (Tr. 230).

A lumbar MRI performed on April 30, 2003, reflected L5-S1 disc herniation and a multilevel disc-bulge. (Tr. 234). White's primary care physician referred her to surgeon Greg Smith,

D.O., who diagnosed a herniated disc at L5-S1 with radiculitis[1] and performed corrective surgery on September 23, 2003. (Tr. 235, 277).

White was sent for another consultative examination on November 26, 2003, with internist Narendra Patel, M.D. (Tr. 282). White reported that she attended physical therapy three times a week and was able to walk by using a cane, but she continued to have back pain that radiated into her right hip and right leg and some numbness in her right leg. She complained that she could barely walk half a block, was unable to climb stairs, and could stand for only five minutes or sit for five to ten minutes before she must get up, move around, or lie down. White was able to tend to her own personal hygiene and dress herself, but her daughter performed all the household chores. (Tr. 282).

White was able to walk from the waiting room to the examination room without her cane, but limped slightly. (Tr. 283). She refused to bend, squat, or walk on her toes and heels, and took a long time to get on the examination table and lie down. Patel reported that White screamed with pain when he touched her legs and would not allow him to perform straight-leg raising. Her deep tendon reflexes were normal in all extremities and sensation was intact. (Tr. 283). Patel diagnosed degenerative disc disease and chronic back pain syndrome, and noted White's non-compliance during the examination. (Tr. 284). An x-ray of White's lumbar spine showed postoperative changes and mild scoliosis. (Tr. 285).

At her follow-up visit with Smith in January 2004, White reported that some of her pain had returned in her right leg, accompanied by weakness and numbness. A repeat MRI on February 3, 2004, showed a re-herniation at L5-S1. (Tr. 290). Smith discussed White's options, which included

---

[1] Radiculitis involves inflammation of the root of a spinal nerve. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1595 (31st ed. 2007).

further surgical intervention, and advised her to contact his office if she decided to proceed with surgery. (Tr. 290-91).

On July 28, 2004, White saw William Mitchell, M.D., for an independent medical evaluation related to her worker's compensation claim. (Tr. 334). White complained that her pain had worsened after surgery and had moved from her low back and left leg to her right leg. She complained of constant low back pain and pain in her right hip and leg, with numbness in three of the toes on her right foot. Williams reviewed the February 2004 MRI and questioned whether the fusion was solid. (Tr. 336). White's lumbar range of motion was minimal as she could move no more than five degrees in any direction, and her gait was antalgic. She refused to walk on her heels and toes. Straight leg raising in a seated position was negative bilaterally. Straight leg raising in the supine position was positive on the right. Williams noted White had a markedly exaggerated pain response during testing and exhibited marked pain behavior that made it difficult to evaluate her. (Tr. 337-38). He recommended further diagnostic studies to assist in determining what future treatment measures might be advisable. (Tr. 339).

Malonis evaluated White again in August 2004 to offer a second opinion. (Tr. 341). White complained of pain that was worse with exercise, sitting, bending, coughing, sneezing, or using her arms. Medications and rest provided only slight relief. She also complained of weakness in her leg. On examination White had some posterior tenderness. She had limited range of motion with more pain on extension. Straight leg raising was mildly positive on the right and negative on the left, and there was slight weakness noted on her right side. Malonis opined that White was a candidate for further surgery. (Tr. 341).

Electromyography (EMG) and nerve conduction velocity studies were performed December 13, 2004, by Gary Gottfried, M.D. (Tr. 443-44). The EMG revealed abnormalities in the paraspinal muscles that were most intense at the L5-S1 level on the right, which Gottfried opined could be a recurrent right L5 radiculopathy[2] or could represent nothing more than post surgery spontaneous activity. No abnormalities were noted in the corresponding muscles of the right lower extremity, and the nerve conduction studies were well within normal limits. (Tr. 444).

Malonis performed decompression surgery on August 1, 2005, to address White's worsening leg pain. (Tr. 411-12, 421). Malonis and White were disappointed with the outcome of this surgery, and White was referred for physical therapy. (Tr. 467, 473-74). White was compliant and cooperative, but after five sessions, the therapist reported that treatment was unsuccessful and that any movement caused White to experience increased pain and leg numbness. Further therapy was deferred until Malonis could reassess White's condition. (Tr. 452).

An MRI in January 2006 revealed disc space narrowing and a fusion at L5-S1, with extensive scar tissue at the surgical site. (Tr. 475, 485). Malonis administered a nerve root block, but White continued to report severe pain with no lasting improvement in her leg pain. (Tr. 470-73). Malonis referred her for trial of a spinal cord stimulator. (Tr. 469). The trial stimulator was successful, with White reporting complete coverage of her leg pain and some coverage of her back pain. (Tr. 683, 738). White had a spinal cord stimulator surgically implanted in September 2006. (Tr. 678-80).

Adedokun reassessed White on November 27, 2006. White reported that the stimulator had

---

[2] Radiculopathy is a disease of the nerve roots. *Id*. at 1595.

not helped alleviate her pain.  She estimated that she could sit for about ten minutes and stand for five minutes, and she continued to complain of sharp pain radiating into her right lower extremity. (Tr. 664).  White ambulated with the assistance of a cane and exhibited an antalgic gait.  She stated that she needed her husband's assistance to dress and undress.  She was unable to hop or squat and refused to perform a tandem gait because of discomfort.  Pain also prevented her from walking on her heels or tiptoes.  (Tr. 665).

On examination White reported chronic back pain with numbness and tingling in her right leg.  (Tr. 665).  Manual muscle testing was difficult because of give-way weakness in all of her extremities.  Sensation was decreased in her right foot, but otherwise intact, and her reflexes were equal and symmetrical.  Adedokun observed evidence of symptom magnification and also reported that White did not give full effort during the examination.  Adedokun assessed a history of chronic low back pain and multiple surgeries.  (Tr. 666).  Lumbar spine x-rays showed post-operative changes at L5-S1, but were otherwise unremarkable.  (Tr. 667).

Adedokun completed a medical source statement addressing White's ability to perform work-related physical activities.  (Tr. 668).  He opined that she was capable of lifting up to twenty pounds frequently, standing for at least two hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday, but she had some limitation in her ability to push or pull with her lower extremities.  (Tr. 668-69).  He opined that White should never climb, but could occasionally balance, kneel, crouch, crawl, or stoop.  (Tr. 669).  Adedokun assessed no manipulative or environmental limitations.  (Tr. 670-71).

In addition to treatment for her physical impairment, White has undergone psychological

evaluation. In April 2000 she reported that she was depressed because of her injury and that the depression had gotten progressively worse in proportion to her back pain. (Tr. 129). The examining physician, John Harris, M.D., assessed a moderately depressed mood with an appropriate affect, and performed a mental status examination, which was unremarkable. (Tr. 130). Harris noted that White's activities of daily living were limited by her chronic lower back pain, but not by any cognitive deficits. He further found that she demonstrated good social skills, that she showed no significant impairment in concentration, persistence, pace or memory, and that there had been moderate deterioration or decompensation in her psychiatric symptoms during the past year due to the onset of back pain. (Tr. 130-31). Harris diagnosed a chronic adjustment disorder with depressed mood, moderate, secondary to chronic back pain and decreased functioning. He assigned a fair prognosis. (Tr. 131).

White was evaluated by clinical psychologist John Savell on July 6, 2001. (Tr. 142-148). She was referred by the Texas Rehabilitation Commission for mental evaluation and assessment of her personal and vocational goals. She advised that she had recently undergone back surgery and was unable to return to her previous work, but expressed an interest in computers. She had been divorced for one month and used her worker's compensation benefits to support herself. (Tr. 143).

Savell recorded his observations during the evaluation. White wore a back brace during the evaluation. She was neatly groomed and friendly, and her thinking was coherent and logical. White was able to remember five digits and reverse four digits accurately. Savell saw no evidence of depression, fatigue, distractibility, anxiety, frustration, or hostility. (Tr. 143). On intellectual testing, White obtained a verbal IQ score of 83, a performance IQ score of 84, and a full scale IQ

score of 82, which placed her in the borderline range of intellectual functioning. (Tr. 144). Her spelling and reading measured in the average range, and her arithmetic skills were at a sixth-grade level. (Tr. 144). Savell found no evidence of a learning disability. (Tr. 148).

Savell also administered personality tests, which reflected scores consistent with a person who has significant medical concerns, and opined that White's personality was characterized by hysteroid adjustment and somatic complaints. (Tr. 146-47). He diagnosed partner relational problems and borderline intellectual functioning, and assessed a current Global Assessment of Functioning score of 70.[3] Based on her intellectual and academic scores, Savell found that White's vocational objective of computer training was appropriate. (Tr. 148).

White was evaluated by psychologist George Esterly on June 16, 2006, to assess whether she was a candidate for surgery. (Tr. 743-746). White reported that her pain was severe and constant, and Esterly observed pain behaviors, including bracing, grimacing, complaining, shifting, and lying down. White's coping strategies included moving very slowly, medication, and rest. (Tr. 744). White reported no previous history of mental health treatment or a psychiatric disorder.

Esterly observed signs of depression with respect to White's interests, weight, sleep, fatigue, and concentration, and White also showed signs of anxiety. (Tr. 744). Her scores on the diagnostic tests were consistent with severe anxiety and mild depression. The MMPI-2 revealed mild to moderate elevation on the subjective depression and psychomotor retardation subscales. She also demonstrated a mild elevation on the hysteria subscale in the areas of lassitude and malaise. (Tr.

---

[3] A GAF score is a standard measure of an individual's overall functioning with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994)(DSM-IV). A score of 70 reflects mild symptoms. *Id.* at 34.

746). Based on the tests administered and the clinical interview, Esterly opined that White was not currently experiencing significant psychological symptoms. (Tr. 745).

On examination White was casually depressed with good personal hygiene and appeared younger than her stated age. Esterly noted that she maintained good eye contact and was cooperative during the interview. She demonstrated an apprehensive mood with a normal affect. Her short-term memory was within normal limits, and her long-term memory was mildly impaired. Her thoughts were coherent, logical, and goal-directed. He diagnosed a chronic pain disorder and assessed a GAF score of 51.[4] (Tr. 745).

2.      First Administrative Hearing

White testified that she was born September 23, 1962, and obtained her GED in 1987. (Tr. 764-65). She last worked in 1999 as a truck driver, and also had work experience as a convenience store cashier. (Tr. 765-66).

White testified that she continued to have a lot of back pain and weakness in her right leg. She walked with the support of a cane, which had been prescribed by her physician, and testified that she could not walk very well without the cane. (Tr. 767). She testified that her pain consisted of a burning sensation that radiated into her buttocks, right leg, and right foot. Standing or sitting aggravated her pain. She estimated that she could sit for two or three minutes at a time. She spent most of the day in bed and also used a heating pad and back massager almost daily. (Tr. 768). Her orthopedic surgeon recommended additional surgery, but she was afraid because her two previous surgeries had not been helpful. (Tr. 768).

_____

[4] A GAF score of 51 to 60 reflects moderate symptoms or moderate impairment in functioning. *Id.* at 34.

White's husband testified that White was afraid of undergoing a third surgery. (Tr. 777). He testified that he sometimes helped her to the restroom and bathed her when she was unable to get out of bed, and at least twice a month she was in so much pain that she soiled the bed because she was unable make it to the restroom. White was often unable to sit up long enough to eat dinner with him. (Tr. 778-779).

3.      Supplemental Administrative Hearing

At the supplemental hearing, White's counsel clarified that they were seeking benefits for the closed period of April 30, 2003 through October 3, 2006, and White limited her testimony to her condition during this period. (Tr. 786). White testified that she underwent a third back surgery in 2005 to remove scar tissue that was pressing on a nerve, but she continued to have radiating back pain after surgery and was told that her only option was a bone stimulator. (Tr. 790). Before she was given the bone stimulator she had spent most of her time lying down and some days did not get dressed or get out of bed, but her condition had improved after she began using the bone stimulator. White testified that she had been on pain medication continuously during the period for which she was seeking benefits and that her medication made her feel drowsy and tired. (Tr. 792). White also testified that she had not been away from her home for more than a few hours at a time and had been unable to take care of herself or her family during that period. (Tr. 792).

White's husband, John Johnson, testified that White was in a lot of pain and took a lot of medicine between April 2003 and October 2006. Johnson had taken care of all of the housework and cooking, in addition to helping his wife. He stated that there had been times when White could not get out of bed, although her condition was better now. (Tr. 793-794).

Medical advisor Charles Murphy opined that, during the period of April 2003 to October 2006, White could have performed sedentary work, with occasional bending, stooping or crouching, no climbing of ladders, ropes, or scaffolds, and no exposure to even moderate vibration. (Tr. 795). He testified that the medical records confirmed that White had degenerative disc disease at L5-S1, which had been treated with multiple surgeries and spinal cord stimulation, but her complaints of pain were clouded by symptom magnification. (Tr.797). Murphy acknowledged that White had been in consistent treatment for pain and testified that there was some basis for her pain complaints, but not to the extent alleged. (Tr. 798).

The ALJ asked Eike to consider a hypothetical individual of White's age, education, and work history who had the ability to perform the exertional requirements of sedentary work with the restrictions identified by the medical advisor. Eike testified this hypothetical individual would be unable to perform White's past relevant work, but there were other entry-level jobs that could be performed. (Tr. 803). Examples included document preparers (with 29,000 jobs nationwide and 1,200 jobs in Texas), small product assemblers (with 56,000 jobs nationwide and 5,000 jobs in Texas), and small products inspectors (with 50,000 jobs nationwide and 3,400 jobs in Texas). (Tr. 803-804). Eike affirmed that there was no conflict between her testimony and the job descriptions in the Dictionary of Occupational Titles (DOT). (Tr. 804).

4.     ALJ Decision

The ALJ found that during the period of April 30, 2003 through October 3, 2006, White had iron-deficiency anemia, exogenous obesity, lumbar radiculopathy, and post-laminectomy syndrome status post-multiple surgical procedures, which constituted a severe combination of impairments,

but did not meet or equal any listed impairment. (Tr. 18). The ALJ found that White did not have a vocationally significant mental impairment. (Tr. 26). The ALJ further found that for the period of April 30, 2003 through October 3, 2006, White retained the residual functional capacity to lift and carry ten pounds, stand and walk at least two hours in an eight-hour work day, sit for at least six hours in an eight-hour workday, and otherwise perform the full range of sedentary work with these restrictions: an inability to climb ladders, ropes and scaffolds; the ability to occasionally balance, stoop, kneel, crouch and crawl; and the need to avoid even moderate vibration. (Tr. 26). Based on the vocational expert's testimony, the ALJ found White was unable to perform her past relevant work during the relevant closed period, but could have performed other work existing in significant numbers in the national and local economies. (Tr. 26-27). Accordingly, he concluded that White was not disabled. (Tr. 28).

E.     DISCUSSION

1.     Severe Impairments

White contends that the ALJ committed legal error by using an improper measure for measuring severity. The ALJ found that White had anemia, obesity, lumbar radiculopathy, and post-radiculopathy syndrome, and that this combination of impairments "had more than a minimal effect on [White's] ability to work." (Tr. 18). The ALJ presumed without further discussion that the foregoing impairments constituted a severe combination of impairments. (Tr. 19). The ALJ concurred with prior agency determinations that White had no severe mental impairment. (Tr. 19, 26). The ALJ also affirmed that he considered all of White's impairments, including those that individually were not severe, throughout his evaluation. (Tr. 19).

-16-

The Commissioner has issued regulations that define a severe impairment as one which significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The Fifth Circuit has found that a literal application of that definition is inconsistent with the statutory language and legislative history of the Social Security Act. Instead, the Fifth Circuit has determined that an impairment is not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000). The court must assume that the ALJ and Appeals Council have applied an incorrect standard at Step Two of the sequential evaluation process unless the correct standard is set forth by reference to *Stone* or another opinion of the same effect, or by an express statement that the ALJ or Appeals Council is using the construction the Fifth Circuit has imposed for what constitutes a severe impairment. *Loza*, 219 F.3d at 393; *Stone*, 752 F.2d at 1106. A case will not be remanded simply because the ALJ did not use "magic words," but remand is required where there is no indication the ALJ applied the correct standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986).

White concedes that the ALJ cited to the *Stone* decision, but asserts that despite this reference, the ALJ applied an improper standard of severity by using language condemned in *Sanders v. Astrue*, 2008 WL 4211146 (N.D. Tex. Sept. 12, 2008). The ALJ in *Sanders* had defined a severe impairment as one "that would have no more than a minimal effect on an individual's ability to work." *Id*. at *7. The ALJ did not refer to *Stone* by name or a similar opinion applying the Fifth Circuit's standard for severity. *Id*. The district court found that, although the difference

between *Stone* and the language used by the ALJ appeared slight, the ALJ's construction was not an express statement of the *Stone* standard.  *Id.*   *But see* SOCIAL SECURITY RULING 85-28, 96-3p (outlining severity standard that uses the "no more than minimal effect" language and clarifying that the agency is using a standard consistent with circuit court decisions).  The district court remanded the case after finding that the failure to follow or cite *Stone* is legal error, which left the district court without discretion to determine whether the error was harmless.  *Id.* at *8.

In *Sanders*, it was a difference in semantics, coupled with the ALJ's failure to cite *Stone* or a similar opinion, that led the court to find that the ALJ applied an incorrect standard for severity. *Id.* at *7.  Unlike *Sanders*, the ALJ who considered White's claims specifically cited *Stone* in addressing the issue of severity.  (Tr. 18-19).  This distinction is significant and does not give rise to the  presumption of legal error that required remand in *Sanders*.

White contends that the ALJ, although he cited *Stone*, misconstrued and misapplied that opinion in dismissing her mental impairment as not severe.  The Social Security regulations outline a process (referred to as  "the technique") to be used for evaluation of mental impairments.  First, symptoms, signs, and laboratory findings are evaluated to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).  Once an impairment is found, the administration will rate the degree of functional limitation resulting from the impairment.  *Id.* §§ 404.1520a(b)(2), 416.920a(b)(2).  Four broad areas of functioning are recognized: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation.  *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). After rating the claimant's functional limitations, the ALJ determines whether the impairment is severe or not severe

given the degree of functional loss found in the four given areas.[5] *Id.* §§ 404.1520a(d), 416.920a(d). When the ALJ finds no or only mild limitation in these four broad areas of mental functioning, the claimant's impairment generally is not found to be severe unless the evidence otherwise indicates more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).

The ALJ applied the special technique for assessment of mental impairments and determined that White's mental impairment resulted in mild restriction in her activities of daily living, mild difficulties in maintaining social functioning, and mild deficiencies of concentration, persistence, or pace, with no episodes of decompensation. (Tr. 26). *See generally* 20 C.F.R. §§ 404.1520a, 416.920a. He noted that most of her limitation in these areas was related to her physical impairments, not a mental impairment.[6] He also noted that White had proven capable of performing semi-skilled work despite test results that placed her in the borderline range of intellectual functioning. Based on his assessment and consistent with the regulations, the ALJ found that White did not have a severe mental impairment. (Tr. 26).

White argues that the ALJ's finding is contrary to *Stone* because the ALJ, in applying the special technique, found mild deficits in her concentration, persistence or pace, as well as social functioning. White has cited no authority for her position that the assessment of mild limitations

---

[5] Assessment of the first three areas requires use of a five-point scale: None, mild, moderate, marked, and extreme. 20 C.F.R. §§ 404.920a(c)(4) 416.920a(c)(4). Assessment of the fourth area requires use of a four-point scale: None, one or two, three, four or more. 20 C.F.R. § 404.920a(c)(4) 416.920a(c)(4).

[6] This finding is compatible with White's report during an earlier stage of disability review that she felt sad because her activities were limited and stressed by financial difficulties, but that her functional limitations were due to physical pain. (Tr. 79).

in a claimant's functioning must translate into a finding that the claimant has a severe mental impairment.[7]  The ALJ's assessment of a non-severe impairment is also supported by the medical records that he reviewed, which reflect no history of formal treatment by a mental health professional and a 2006 independent psychological evaluation that yielded an essentially unremarkable mental status examination and cleared her to undergo surgery.[8]  (Tr.  22, 26).

White has not established that the ALJ committed legal error at Step Two of the sequential evaluation process or that the ALJ's assessment of her severe impairments is unsupported by substantial evidence.[9]

2.     Residual Functional Capacity

White asserts that the ALJ's assessment of her residual functional capacity (RFC) is erroneous and unsupported by substantial evidence.  The ALJ assessed a RFC that is consistent with the testimony of the medical advisor, but White contends that the ALJ and the medical advisor failed to consider the impact of pain on her ability to perform work-related activities.

Murphy testified that there was some basis for White's complaints of pain, but not to the

---

[7]  To adopt White's position would have the extreme result of nullifying the Commission's regulations to the contrary, which provide that application of the special technique resulting in findings of no or mild limitations in the four recognized areas of functioning generally leads to the conclusion that a mental impairment is not severe unless the evidence indicates differently.  *See* 20 C.F.R. § 404.1520a(d)(1), 416.920a(d)(1).

[8]  In her brief White attempts to shift the burden to the Social Security Administration, but the burden of demonstrating severity at Step Two is with the claimant.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5, 96 L.Ed.2d 119 (1987).  Nor is her reliance on Esterly's assessment of a GAF score of 51, which the ALJ acknowledged was an indication of moderate symptoms, irrefutable evidence that the ALJ's decision is erroneous or unsupported. *See, e.g., Sambula v. Barnhart*, 285 F. Supp. 2d 815, 825 (S.D. Tex. 2002)(finding substantial evidence to support ALJ's decision because objective findings rebutted child claimant's assessed GAF score of 45).

[9]  White also disputes the ALJ's determination that she can perform the job of document preparer because of its mental demands.  Her argument will be addressed *infra* as it relates to her challenge to the vocational evidence.

extent she alleged. (Tr. 799-800). He explained that he based his testimony on the opinions of multiple doctors who had examined her. (Tr. 800). The ALJ also addressed White's allegations regarding her pain level, subjective complaints, and functional limitations, but found her complaints minimally credible at best and not reasonably supported by the objective medical evidence. (Tr. 22).

Whether pain is disabling is an issue for the ALJ, who has the primary responsibility for resolving conflicts in the evidence, and that determination is entitled to considerable deference. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Wren v. Sullivan,* 925 F.2d 123, 128 (5th Cir.1991); *James v. Bowen,* 793 F.2d 702, 706 (5th Cir.1986). A claimant's statements as to pain and other symptoms are not conclusive evidence of disability, but must be accompanied by medical signs and findings of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged and that would lead to the conclusion that an individual is disabled. 42 U.S.C. §423(d)(5)(A); 20 C.F.R. §§ 404.1529, 416.929; SOCIAL SECURITY RULING 96-7p. Once the impairment is found, the ALJ evaluates the intensity, persistence and limiting effects of the symptoms on the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1529, 416.929. The court will not uphold an unfavorable credibility evaluation where the uncontroverted medical evidence shows a basis for the claimant's complaints unless the ALJ weighs the objective medical evidence and articulates reasons for discrediting the claimant's subjective complaints. *Falco v. Shalala,* 27 F.3d 160, 163 (5th Cir.1994); *Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988).

The ALJ addressed White's credibility, but found it eroded by continual findings of symptom magnification. (Tr. 25). White asserts that the ALJ erred in relying on evidence of positive Waddell's signs as an indicator that she was not credible, but the ALJ's determination is consistent

with Murphy's expert testimony and the medical records, which contain numerous reports of symptoms magnification. (Tr. 796-97). The ALJ also reviewed the reports of White giving incomplete effort, inconsistent performances, and exaggerated responses when examined. (Tr. 25). *Cf*. *Rodriguez v. Barnhart*, 2005 WL 492857, *4 (W.D. Tex. 2005)(finding that ALJ committed no error in interpreting plaintiff's Waddell's signs as malingering given the medical reports of multiple positive signs and poor effort on testing). He acknowledged that diagnostic studies revealed abnormalities consistent with some of White's reported symptoms, but noted the lack of significant objective findings in many of her examinations, which indicated that her subjective complaints were grossly out of proportion. (Tr. 25).

White argues that the ALJ failed to consider the impact of a mental impairment on her perception of pain and ability to work, but the ALJ addressed the existence of a mental impairment and found it was not severe. Moreover, the ALJ did not completely dismiss White's allegations of pain, but recognized that even moderate levels of pain and functional loss are not incompatible with the ability to perform some level of work activity. (Tr. 24). He also acknowledged that her surgical history prevented her from working at the heavier levels of exertion. (Tr. 25). The ALJ is not required to give precedence to subjective evidence over objective medical evidence. *Hollis*, 837 F.2d at 1385. White has failed to demonstrate that the ALJ's assessment of her subjective complaints is not entitled to deference.

White also asserts that the ALJ failed to consider her husband's testimony, which corroborated her testimony of severe functional limitations during the period at issue. Information from other non-medical sources, such as spouses or friends, may be used to show the severity of an

individual's impairments and how the impairments affect the individual's ability to work. 20 C.F.R. §§ 404.1513, 416.913. The ALJ summarized the testimony that White's husband provided at both hearings. He did not identify the individual weight, if any, that he gave to that testimony, but stated that the objective evidence, White's allegations, and the other non-medical evidence failed to establish that White was so limited as to be disabled. (Tr. 23).

The Fifth Circuit has declined to prescribe any rigid or set formula for the ALJ to follow when articulating the reasons underlying his decision on disability.[10] *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994). Although it might be advisable or helpful for the ALJ to specify the weight assigned to other lay testimony, the ALJ's decision reflects that he was aware of and considered White's limited daily activities, but found the medical record did not substantiate the degree of pain and functional limitation alleged. Substantial evidence supports the ALJ's findings with respect to White's credibility and her RFC during the closed period for which she sought benefits.

3.     Vocational Expert Testimony

White contends that the Commissioner failed to meet his burden to establish that she is capable of performing other work that exists in significant numbers. She asserts that the ALJ's attempt to satisfy this burden through expert testimony failed because the vocational expert responded to a defective hypothetical and identified jobs that exceed White's RFC.

The hypothetical presented to the vocational expert must reasonably incorporate all of the

---

[10] White asserts that it is the policy in this circuit that weight be given to lay testimony when fully supported by the reports of treating physicians, but she cites a Sixth Circuit case for this position. *See Lashley v. Secretary of Health and Human Servs.*, 708 F.2d 1048, 1054 (6th Cir. 1983). Moreover, the symptom-magnification and credibility concerns in White's case appear to distinguish her case from the circumstances in *Lashley*.

disabilities recognized by the ALJ and the claimant or his representative must be afforded the opportunity to correct any deficiencies in the ALJ's question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A claimant's failure to point out problems in a defective hypothetical does not salvage that hypothetical as a proper basis for a disability determination. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). But most of White's arguments about the hypothetical are nothing more than a restatement of her position that the ALJ erred in his assessment of her mental impairment and her RFC during the period for which she seeks benefits. Being repetitive, the issues need not be addressed again. A comparison of the hypothetical and the ALJ's assessment of White's RFC reflects that they are identical, and White's counsel was given an opportunity to question the vocational expert during the hearing. The ALJ did not present the vocational expert with a defective hypothetical.

White also denies that she could perform any of the jobs identified by the vocational expert. She asserts that her mental impairment would preclude her from performing the job of document preparer because it has a reasoning development level that is not compatible with her mild deficiency in concentration, persistence or pace. *See* DICTIONARY OF OCCUPATIONAL TITLES § 249.587-018 (rev. 4th ed. 1991)(occupational definition of document preparer). *See generally id.* app. C (Scale of General Education Development). The ALJ did not err in relying on the vocational expert's testimony. The ALJ found no severe mental impairment and assessed no work-related mental limitations in White's RFC; therefore, there is no conflict between White's RFC and the mental demands of the job of document preparer.

White asserts that the two other jobs identified by the vocational expert do not comport with the ALJ's assessment of her exertional ability or lack of transferable work skills. She asserts that the job of small products assembler demands light exertion, but the ALJ found her limited to sedentary exertion. For support, she cites to two listings in the DOT for small-product assembly jobs that require light exertion. *Id.* §§ 706.684-022, 739.687-030. The vocational expert did not refer to either of these positions as support for her testimony, and the Commissioner has responded to White's argument by pointing out numerous assembly occupations in the DOT that are identified as sedentary. White's selective recitation of listings that patently do not fit within the hypothetical does not undermine vocational expert testimony that expressly accounted for the limitations given by the ALJ. *Cf. Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000)(cautioning against allowing claimant to scan record for unexplained conflicts between expert testimony and voluminous provisions of the DOT, then present conflict as reversible error when it was not considered sufficient to merit adversarial testing during the hearing).

White also asserts that the third job that Eike identified, as an unskilled small parts inspector, has a specific vocational preparation (SVP) level of 3, which is the equivalent of semi-skilled work.[11] White asserts that the vocational expert's testimony about the entry-level nature of the job conflicts with the DOT and that this conflict is prejudicial because the ALJ did not find that she had transferable work skills, which would be necessary if she is expected to perform semi-skilled work.

_____

[11] The specific vocational preparation (SVP) level refers to the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a particular occupation. *See* DICTIONARY OF OCCUPATIONAL TITLES app. C (rev. 4th ed. 1991). Unskilled work usually requires less than thirty days training, which corresponds to an SVP of 1 or 2; semi-skilled work corresponds to an SVP of 3 or 4; and skilled work requires an SVP level of 5 or higher. SOCIAL SECURITY RULING 00-4p. *See generally* 20 C.F.R. §§ 404.1568, 416.968.

(Tr. 27). *See* 20 C.F.R. §§ 404.1568(d), 416.968(d) (addressing transferability of skills). The court need not decide if this argument has merit. The ALJ's decision at Step Five still has the support of substantial evidence even if the inspector jobs are excluded because the jobs of document preparer and small products assembly reflect a significant number of other jobs (with a combined estimate of 85,000 jobs nationwide) that White was capable of performing during the relevant period.

The Commissioner met his burden to establish that White is capable of performing other work that exists in significant numbers, and White has not demonstrated that the ALJ's determination at Step Five is the result of legal error.

RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until March 11, 2009. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28

U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until March 11, 2009, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED FEBRUARY 17, 2009.


\_\_/s/\_\_ Charles Bleil _____
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE